**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 8, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MORRISON KNUDSEN CORPORATION,
doing business as MK-Ferguson Company,
now known as Washington Group
International, Inc., an Ohio corporation,

       Plaintiff/Counter-Defendant -
       Appellant/Cross-Appellee,

   v.

GROUND IMPROVEMENT
TECHNIQUES, INC., a Florida corporation,

       Defendant/Counter-Claimant -
       Appellee/Cross-Appellant,

_____

FEDERAL INSURANCE COMPANY,

       Interested Party -
       Appellant/Cross-Appellee.

Nos. 06-1434, 06-1435
and 06-1463

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 95-CV-2510-JLK-BNB)**

---

Daniel R. Frost, Holland & Hart LLP, Denver, Colorado, and Jeffrey S. Price,
Manier & Herod, PC, Nashville, Tennessee (Joseph W. Halpern, Timothy W.
Gordon, and Anthony J. Navarro, Holland & Hart LLP, Denver, Colorado; L. Jay
Labe, Pendleton, Friedberg, Wilson & Hennessey, P.C., Denver, Colorado; and
Sam H. Poteet, Jr., Manier & Herod, PC, Nashville, Tennessee, with them on the
briefs), for Plaintiff/Counter-Defendant - Appellant/Cross-Appellee and Interested
Party - Appellant/Cross-Appellee.

Steven R. Schooley, Holland & Knight, Orlando, Florida (Frederick Huff, Law Offices of Frederick Huff, Denver, Colorado, with him on the briefs), for Defendant/Counter-Claimant - Appellee/Cross-Appellant.

Before **BRISCOE**, **EBEL**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Morrison Knudsen Corporation ("MK"), a federal contractor, terminated its subcontractor, Ground Improvement Techniques, Inc. ("GIT") for an alleged default and sued GIT for damages. GIT counterclaimed for wrongful termination. The case initially went to trial in November of 1996. Concluding the termination was wrongful, the jury awarded GIT $5.6 million. The case was appealed to this court in *Morrison Knudsen Corporation v. Fireman's Fund Insurance Company* (*Morrison Knudsen I*), 175 F.3d 1221 (10th Cir. 1999). In connection with the appeal, MK and its surety, Federal Insurance Company ("Federal") posted a supersedeas bond. In *Morrison Knudsen I*, we affirmed liability, but reversed and remanded to the district court on the issue of damages.

Following a retrial on damages, GIT was awarded over fifteen million dollars. The district court held Federal and MK jointly and severally liable for the amount of the supersedeas bond. MK and Federal appeal from that judgment,

-2-

arguing the supersedeas bond was discharged and is now void. MK also challenges the district court's award of prejudgment interest; alleges that the damages award contains duplication; and claims, as a matter of law, the district court should have entered judgment for MK on claims relating to R.N. Robinson & Son, Inc. ("Robinson"), Fireman's Fund, and an equitable adjustment claim on a performance bond. GIT cross-appeals, arguing the district court applied incorrect interest rates in its calculation of prejudgment and post-judgment interest. It also contends MK and Federal should be jointly and severally liable for the entire judgment. Our appellate jurisdiction arises under 28 U.S.C. § 1291. We **affirm** in part, **reverse** in part, and **remand** for further proceedings consistent with this opinion.

## II. BACKGROUND

This appeal arises out of a long-standing contract dispute between MK[1] and GIT. In 1983, the United States Department of Energy hired MK to manage its Uranium Mill Tailing Remedial Action project, a cleanup of radioactive mill tailings at sites around the country. MK subcontracted with GIT (the "contract") in March 1995 to clean up the Slick Rock, Colorado site. GIT hired several lower-tier subcontractors ("subs"), including Robinson, for excavation; Bogue Construction, for trucks; Keers Environmental, Inc., for asbestos abatement; and G.A. Western Construction Co., for bridge work.

---

[1]MK is now known as Washington Group International, Inc.

The project did not go well.  GIT and its subs encountered delays, difficulties, and increased costs.  GIT attributed these to MK's defective specifications, failure to timely secure permits, rigid interpretation of specifications and safety requirements, and propensity to reject work plans.  In September 1995, MK terminated GIT for default and simultaneously sued GIT for damages.  GIT counterclaimed for wrongful termination, seeking damages in the form of payment for completed work under the contract and compensation for additional costs occasioned by MK and not contemplated under the contract.

The case went to trial in November of 1996.  The jury concluded MK's termination of GIT was wrongful and awarded GIT $5.6 million.  MK unsuccessfully moved for judgment as a matter of law, claiming deficiencies in GIT's evidence of damages and of MK's liability.  The case was then appealed to this court in *Morrison Knudsen I*, 175 F.3d at 1221.  In connection with the appeal, MK posted a supersedeas bond for $7,075,000 through its surety, Federal.  Although this court affirmed the ruling on liability, we reversed the damage award because GIT failed, in several categories of damages, to present sufficient evidence.  *Id.* at 1243-48, 1260-61.  Further, because the jury returned a general verdict, this court was unable to determine whether any parts of the jury award were allowable categories of damages supported by sufficient evidence.  *Id.* at 1254-55.  We thus vacated the judgment and remanded for a new trial limited to the issue of damages.  *Id.* at 1255.

The issue of damages was retried in May 2006. The jury awarded GIT over fifteen million dollars in costs and equitable adjustments.[2] Following post-verdict motions culminating in an August 16, 2006 hearing, the district court entered judgment in favor of GIT in the amount of $15,644,582. The district court ruled MK and Federal were jointly and severally liable for the judgment, up to the amount of the bond. Prejudgment interest was awarded at the federal rate of 5.09% accruing from the date of termination. The district court also awarded post-judgment interest to accrue at a rate of five percent per annum. These appeals followed.

## III.   SUPERSEDEAS BOND

Following the first trial, a judgment of $5.6 million was awarded to GIT. This judgment was ultimately amended to $6,132,837.70 to include prejudgment interest and costs. On December 11, 1996, MK filed a motion to stay the execution of the judgment pending appeal. The district court granted the motion, conditioned on MK tendering a supersedeas bond with a penal sum of seven million dollars. Thereafter, MK as principal and Federal as surety tendered Supersedeas Bond No. 8131-18-24 ("Supersedeas Bond") to the court for the

---

[2]An equitable adjustment is a real or constructive change in contract price. It compensates a contractor for increased costs reasonably incurred because the government increased the amount or difficulty of work required by the contract or delayed or accelerated that work. *Morrison Knudsen Corp. v. Fireman Fund Ins. Co.* (*Morrison Knudsen I*), 175 F.3d 1221, 1243-44 (10th Cir. 1999).

purpose of ensuring the judgment would be collectible during the stay. On May 13, 1999, the court ordered the bond to be increased by $75,000.

The Supersedeas Bond states:

[T]he condition of this obligation is that if the appellant shall prosecute this appeal to effect and shall satisfy the judgment in full, together with costs, interest, and damages for delay if the appeal is finally dismissed or if the judgment is affirmed or shall satisfy in full such judgment as modified together with such costs, interest, and damages as the Court of Appeals may adjudge and award, this obligation shall be void; otherwise it shall remain in full force and effect.

Following the second trial, GIT submitted its suggested "Modified Amended Judgment" requesting judgment against Federal and MK jointly and severally for the amount of the bond. Federal filed a brief in opposition to the entry of a modified judgment and a motion for an order discharging the Supersedeas Bond, arguing the bond became void when *Morrison Knudsen I* was issued on May 11, 1999. MK joined Federal's motion. The district court concluded Federal's obligations had not been discharged, characterizing *Morrison Knudsen I* as remanding for a quantification of amounts due to GIT. On appeal, MK and Federal ask this court to hold the bond was discharged. Cross-appealing, GIT seeks a ruling that Federal is jointly and severally liable for the entire judgment, an amount far in excess of the $7,075,000 penal sum of the bond. We hold *Morrison Knudsen I* did not discharge the Supersedeas Bond and it is still in effect. Federal's liability, however, is limited to the penal sum of the bond.

## A. Effect of *Morrison Knudsen I* on Supersedeas Bond

The question we must answer is whether *Morrison Knudsen I*, affirming MK's liability, but vacating the judgment and remanding for a new damages trial, resulted in MK prosecuting the appeal "to effect." If so, Federal cannot be held liable for the judgment against MK and its obligations are void. The proper standard of review of the district court's interpretation of a bond depends on whether the bond is unambiguous. Where, as here, the contract is unambiguous, "a trial court's interpretation of a contract presents an issue of law which is reviewed de novo on appeal." *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992) (quotation and alteration omitted); *see also Grubb v. Fed. Deposit Ins. Corp.*, 833 F.2d 222, 224 (10th Cir. 1987) (explaining question of whether supersedeas bond should be exonerated is a question of law).[3]

This court has not had occasion to interpret the "prosecute this appeal to effect" language contained in the Supersedeas Bond. The Supreme Court, interpreting similar language in 1879, explained "[i]f, on the final disposition of a writ of error on appeal, the judgment or decree . . . is not substantially reversed . . . [the] appeal has not been prosecuted with effect." *Gay v. Parpart*, 101 U.S.

---

[3]When a district court relies on extrinsic evidence to interpret an ambiguous contract, this court reviews for clear error. *Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 130 (10th Cir. 1990). The question of whether a contract is ambiguous is a question of law that is reviewed de novo. *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 589 (10th Cir. 2007). Neither party argues the Supersedeas Bond is ambiguous. After our review, we conclude the bond is only susceptible to one interpretation and is thus unambiguous.

391, 392 (1879); *see also Crane v. Buckley*, 203 U.S. 441, 447 (1906) (explaining "prosecuting to effect" means "prosecuting his appeal with success; to make substantial and prevailing his attempt to reverse the decree or judgment awarded against him").

Thus, our task is to determine if MK "substantially prevailed" in *Morrison Knudsen I*. In *Beatrice Foods v. New England Printing*, the Federal Circuit explained:

> when an appellee has proven that damages are due, and the remand is merely to determine the proper quantum of injury, then it is not unreasonable that the bond remain effective during this recalculation period. Put another way, when an appellant has merely succeeded in having the case remanded for recomputation of damages, it would be a stretch to say that the appeal was 'substantially' successful, or that the judgment was 'substantially' reversed.

930 F.2d 1572, 1576 (Fed. Cir. 1991); *see also Franklinville Realty Co. v. Arnold Constr. Co.*, 132 F.2d 828, 829 (5th Cir. 1943) (surety remained liable where remand was to determine whether the judgment "should be for the same or a less sum"). Where, however, the damage award is reversed and the plaintiff must prove damages, courts have held the surety's obligations are discharged. *Neeley v. Bankers Trust Co. of Texas*, 848 F.2d 658, 659-60 (5th Cir. 1988) (holding appellant prosecuted appeal to effect where court of appeals ordered retrial because plaintiff failed to prove damages).

Summarizing the approach taken by the regional circuits, the *Beatrice Foods* court explained:

> [T]he surety remains liable when the question on remand is not whether a party will receive damages, but merely how the damages will be calculated. . . . If, after an appeal, there remains a question of whether *any* compensable harm was done, then the bond may be allowed to lapse. When the plaintiff has yet to prove any damages, it is unnecessary and unfair to ask the defendant to continue to provide a bond to ensure that money will be available should damages be proven. An appeal has been prosecuted to effect, then, when appellee must still prove on remand that he suffered a compensable harm.

930 F.2d at 1576.

The parties, not surprisingly, interpret differently the effect of *Morrison Knudsen I*. MK and Federal argue this court's decision substantially reversed the district court because the judgment was entirely vacated. They contend that on remand, this court required damages to be proven, not just recalculated. GIT, on the other hand, submits MK lost the major battle on appeal when this court affirmed liability. Although the judgment was vacated, MK remained liable for undisputed obligations covered by the Supersedeas Bond. Had the jury used a special verdict form in the first trial, this court would have upheld any jury award for contract sums never paid.

MK and Federal rely heavily on *Neeley* and its progeny. In that case, the Fifth Circuit affirmed liability but reversed on the issue of damages. 848 F.2d at 659. The case was remanded for a new trial on damages. *Id.* The court explained because the entire award of damages had been vacated by the appellate court, no liability remained on the supersedeas bond. *Id.* at 660. "The retrial on

damages results in an entirely new judgment. The bond is limited to any decree of the court of appeals; it does not include an entirely new judgment of the district court." *Id.* *Neeley* explained the language of the bond at issue in that case limited liability to amounts affirmed in an appellate decree.[4] *Id.*; *see also Aetna Cas. & Sur. Co. v. LaSalle Pump & Supply Co.*, 804 F.2d 315, 317-18 (5th Cir. 1986) (holding surety's liability discharged when original judgment reversed). As there was no decree to enforce, the surety could not remain liable. *Id.*

We do not read the language of the Supersedeas Bond to limit liability to amounts explicitly affirmed on appeal. The purpose of a supersedeas bond "is to secure the judgment throughout the appeal process against the possibility of the judgment debtor's insolvency." *Grubb*, 833 F.2d at 226. Although this court remanded for a retrial on the issue of damages, we affirmed the judgment finding MK's termination of GIT was wrongful. *Morrison Knudsen I*, 175 F.3d at 1261. We held, however, that GIT failed to prove entitlement to specific categories of damages. GIT claimed roughly $11.35 million in damages at the first trial. *Id.* at 1242. The categories of damages included equitable adjustments ($3 million),

---

[4]The supersedeas bond in *Neeley* stated, "Appellants shall prosecute their appeal with effect; and in case the Judgment of the United States Court of Appeals or the United States Supreme Court shall be against them, they shall perform its judgment, sentence or decree, and pay all such damages as said Court may award against them." *Neeley v. Bankers Trust Co. of Texas*, 848 F.2d 658, 659 (5th Cir. 1988).

lower-tier subcontractor claims ($3.7 million), attorney's fees ($1.35 million), unpaid contract work and post-termination equipment expenses and work ($1.9 million), and other ($1.4 million).  *Id.*  This court held GIT failed to offer sufficient evidence to support its claims for the equitable adjustments, attorney's fees, and most of the damages claimed on behalf of the sub-contractors.  *Id.* at 1242-54.  We explained that because the district court failed to use a special verdict form, it was impossible to untangle the categories of damages for which there was sufficient evidence as compared to those which needed a retrial.  *Id.* at 1254.  Had a special verdict form been used, "[w]e could then vacate any award of damages on the attorney's-fees, equitable-adjustment, and subcontractor claims, while letting stand any amounts the jury had awarded on GIT's other claims."  *Id.*

Unlike *Neeley*, this court recognized GIT was entitled to some form of damages.  It was prevented, however, from affirming those portions of the judgment based solely on the district court's failure to use a special-verdict form.[5] In the first trial, GIT successfully proved certain damages were due.  *Morrison Knudsen I*, 175 F.3d at 1243 n.28 ("The parties do not seem to dispute GIT's right to damages for work that the contract required, and that GIT performed, but for which MK did not pay.");  *Id.* at 1242 n.25 ("MK does not specifically challenge

---

[5]Although the judgment with respect to damages was vacated in *Morrison Knudsen I*, this alone is not the touchstone of prosecuting an appeal "to effect." *Beatrice Foods*, 930 F.2d at 1573 (original damage award vacated).

the sufficiency of the evidence supporting GIT's claimed damages, totaling roughly $1.9 million, for work performed under the contract for which MK withheld payment; for work MK required it to perform after the termination; and for equipment MK required it to leave on site after the termination.").  Thus, we cannot say that MK "substantially prevailed" on its first appeal.  This case's unique procedural history reflects that MK's liability was affirmed and several categories of damages, although not affirmed, were vacated merely because of a procedural error.  This case lies somewhere between a remand for mere recalculation of damages, i.e., *Beatrice Foods*, 903 F.2d at 1576, and one in which no sum of damages was properly proved and the entire judgment was vacated, i.e., *Neeley*, 848 F.2d at 660.  Because GIT proved entitlement to some damages in the first trial, this case is more like *Beatrice Foods* and less like *Neeley*.  *See, e.g.*, *Beatrice Foods*, 930 F.2d at 1576 (explaining surety is released only when there remains a question of whether *any* compensable harm was done).  We hold, therefore, that the Supersedeas Bond is still enforceable because MK failed to prosecute its appeal "to effect."

**B.    Joint and Several Liability**

In its cross-appeal, GIT argues MK and Federal are jointly and severally liable for any and all amounts awarded in this litigation.  The terms of the bond include coverage for "such judgment as modified together with such costs, interest, and damages as the Court of Appeals may adjudge and award."  GIT

interprets this language to bind Federal for any and all amounts awarded in this matter. This argument ignores one of the most fundamental rules of suretyship: except in limited circumstances, a surety's liability cannot extend beyond the penal sum announced in the bond.[6] *See Maryland Cas. Co. v. Alford*, 111 F.2d 388, 390 (10th Cir. 1940) ("Under the great weight of authority, a surety's liability is limited by the penal sum named in the bond . . . ."); *see also Houston Fire & Cas. Ins. Co. v. E.E. Cloer Gen. Contractor, Inc.*, 217 F.2d 906, 912 (5th Cir. 1954) ("The surety's obligation is of course limited to the penal sum named in the bond."); *Mass. Bonding & Ins. Co. v. United States*, 97 F.2d 879, 881 (9th Cir. 1938) ("It is fundamental in the law of suretyship that a bondsman cannot be held for any default of his principal in an amount greater than the penal sum of the bond."). The penal sum of the bond was $7,075,000 and Federal's obligations are thus capped at that amount.[7]

---

[6]Such limited circumstances include, for example, when a bond is legally mandated and the statute provides that any bond issued in furtherance of the law is deemed to contain the statutorily mandated terms. In such cases, the surety will be bound to the minimum coverage provided by law. Restatement (Third) of Suretyship & Guaranty § 71(2) (1996). Further, as a matter of contract interpretation, if the parties modify their agreement to include liability in excess of the penal sum, courts will honor that bargained-for agreement. *See, e.g.*, *Eichhorn v. Brewer*, 755 P.2d 660, 662 (Okla. 1998) (allowing recovery in excess of penal sum where supersedeas bond was amended to provide coverage for "all court costs incurred in connection with said appeal or any judgment entered in the lower court" (emphasis omitted)). Such circumstances do not arise in this case.

[7]As Federal concedes, pursuant to 28 U.S.C. § 1961(a), it is also obligated to pay post-judgment interest on this sum.

GIT urges this court to ignore substantial precedent limiting a surety's liability to the penal sum and hold Federal liable for the entire judgment. GIT's proposed interpretation of the bond would wholly abrogate the need to specify a penal sum. The first paragraph of the bond states, "[w]e . . . Federal Insurance Company, surety, are held and firmly bound to the appellee in the sum of Seven Million [Dollars] . . . to be paid to appellee . . . ." This represents an express agreement between the parties to provide security for the judgment *in the sum* of a certain amount.

The district court did not err in its judgment limiting Federal's liability to the penal sum. Even assuming error, however, that error was invited. Not only did GIT fail to raise this issue below, it filed a "Proposed Modified Amended Judgment" in the district court that was limited to the penal sum of the bond. The district court ultimately adopted GIT's proposal and entered a written judgment limiting Federal's liability to the penal sum. This constitutes invited error. *See United States v. Shaffer*, 472 F.3d 1219, 1227 (10th Cir. 2007) (holding in the event the district court erred, it was invited); *United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005) ("[T]he invited-error doctrine precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt."). Therefore, Federal's liability is limited to the penal sum of the bond.

## IV. PREJUDGMENT INTEREST

-14-

The district court ordered prejudgment interest to accrue on the total award amount of $15,644,582 from September 29, 1995, to August 16, 2006, at the applicable federal rate of 5.09%.  MK appeals this ruling, contending that (1) the contract and federal law prohibit prejudgment interest in this case; or (2) in the alternative, the district court based its calculation on an incorrect accrual date.  In its cross-appeal, GIT argues the district court incorrectly used the federal rate instead of Colorado's interest rate.

"An award of prejudgment interest is within the district court's discretion." *Resolution Trust v. Fed. Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1506 (10th Cir. 1994).  Where, however, the prejudgment award rests on an interpretation of federal law, we review the district court's interpretation de novo.  *Frymire v. Ampex Corp.*, 61 F.3d 757, 772 (10th Cir. 1995).  In order to determine whether prejudgment interest is appropriate, this court first explores whether the federal law in question expressly allows or expressly forbids prejudgment interest.  *Id.* "In the absence of an unequivocal prohibition of interest, we must test whether such interest should be included by appraising the congressional purpose in imposing the obligation in light of general principles we deem relevant."  *Id.* at 772-73 (quotations and alteration omitted); *see also Rodgers v. United States*, 332 U.S. 371, 373 (1947).

### A.    The Federal Acquisition Regulation System and Prejudgment Interest

"Prejudgment interest is an element of complete compensation . . . ." *West Virginia v. United States*, 479 U.S. 305, 310 (1987). It "serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Id.* at 311 n.2.

The contract's default-termination clause incorporated *verbatim* the standard federal default clause for fix-price construction contracts. 48 C.F.R. § 52.249-10(a), (c). That clause is part of the Federal Acquisition Regulation System ("FAR"). *See* Title 48 C.F.R. (2008). As incorporated into the contract, the clause allowed MK to terminate GIT if the work was delayed by GIT's inexcusable lack of diligence. *Id.* § 52.249-10. The clause further provided that a wrongful termination would be treated as a termination for convenience:

> If, after termination . . ., it is determined that [GIT] was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.[8]

J.A. Vol. 10 at 2659; 48 C.F.R. § 52.249.10(c). The contract's dispute clause provides that "[a]ny substantive issue of law in [litigation concerning the contract] shall be determined in accordance with the body of law applicable to procurement of goods and services by the Government." J.A. Vol. 10 at 2650.

---

[8]As this court recognized in *Morrison Knudsen I*, the contract provides that the FAR governs the parties' substantive rights under the contract. 175 F.3d at 1230. MK is considered the "government" for the limited purpose of applying the FAR provisions.

The disputes clause and the contract must be interpreted in light of the regulations controlling the interpretation of federal contracts. *Morrison Knudsen I*, 175 F.3d at 1230. The controlling regulations since 1984 have been the FAR. *Id.*

In *Morrison Knudsen I*, this court held MK's termination of GIT was wrongful. 175 F.3d at 1261. Under the terms of the contract and the FAR, therefore, the rights and obligations of the parties are treated under a termination-for-convenience paradigm. MK argues under this paradigm, the district court erred by awarding GIT prejudgment interest. The FAR prohibits the government from paying "interest on the amount due under a settlement agreement or a settlement by determination. The Government may, however, pay interest on a successful contractor appeal from a contracting officer's determination . . . ." 48 C.F.R. § 49.112-2(d). MK argues the retrial of this lawsuit constitutes a "settlement by determination" and therefore precludes the assessment of prejudgment interest.

This argument is without merit. Although the termination of GIT must be treated as a termination for convenience, MK wholly failed to act under a termination-for-convenience paradigm and therefore waived its claims to the prohibition on prejudgment interest benefit set out in the FAR. "Settlement by determination" is not the legal equivalent of settlement through protracted litigation in the federal courts. Instead, it is a term of art encompassing exact procedures through which a government contractor may settle its claims. *See* 48

-17-

C.F.R. § 49.109-7. The "primary objective" under the termination-for-convenience protocol is "to negotiate a settlement by agreement." *Id.* § 49.201(b). If, however, the government and contractor cannot agree, the government may "determine" an appropriate settlement fully compensating the contractor, and the contractor may appeal. *See id.* § 49.109-7(a), (f). Had MK proceeded under this paradigm, the federal regulations would have required MK to provide notice and effect a no-cost settlement if GIT was willing to accept one. *Id.* §§ 49.109-7(b), 49.101(b). Instead, MK sued GIT for damages. There is thus no prohibition on prejudgment interest.

Although there is no prohibition on prejudgment interest, neither does the FAR expressly provide for prejudgment interest. As recognized by the district court, the provision allowing for prejudgment interest in the Contracts Dispute Act ("CDA") does not apply to this case.[9] *See US W. Commc'n Serv., Inc. v. United States*, 940 F.2d 622, 627 (Fed. Cir. 1991) ("A government contractor's dispute with its subcontractor [is] by definition specifically excluded from CDA coverage."). The district court, however, analogized to this provision, concluding

---

[9]"Generally, the United States is immune from interest on claims against it unless it has waived immunity or is operating as a private commercial enterprise." *Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.*, 25 F.3d 1493, 1506 (10th Cir. 1994); *see also Library of Congress v. Shaw*, 478 U.S. 310, 317-18 & n.5 (1986) (applying strict construction of statutory waivers); *Loeffler v. Frank*, 486 U.S. 549, 555 (1988) (applying liberal construction to agency commercial enterprises). The CDA acts to waive the government's sovereign immunity on contract claims when the party appeals a settlement determination.

MK forced GIT to appeal its "determination" that GIT was not entitled to money for work completed under the contract. This analogy is insightful in showing that even where the government is a party to the contract, Congress intended prejudgment interest to be available when the injured party is delayed in obtaining compensation. *See, e.g.*, *Frymire*, 61 F.3d at 772-73.

Thus, we must determine whether prejudgment interest is supported under "compensatory principles" and "fundamental considerations of fairness." *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1554 (10th Cir. 1992). This court has explained that under federal law, prejudgment interest is generally available. *Id.*; *see also Royal Indem. Co. v. United States*, 313 U.S. 289, 296 (1941) ("In the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for non-payment of the amount found to be due."). Under both compensatory principles and considerations of fairness, the award of prejudgment interest was proper. When GIT was wrongfully terminated, MK withheld payment under the contract. For more than thirteen years GIT has been deprived of the time-value of monies owed to it. Prejudgment interest was proper as a measure of compensatory damages and is not precluded by the equities. *See Anixter*, 977 F.2d at 1554. The district court did not abuse its discretion by awarding GIT prejudgment interest.

### B. Accrual Dates

The district court awarded GIT prejudgment interest on its entire claim from the date of termination: September 29, 1995. MK argues GIT had not incurred many of their costs at this point. It therefore submits prejudgment interest must be recalculated based on the various accrual dates of GIT's damages. GIT counters with MK's stipulation in the first trial that prejudgment interest should be calculated on all damages from the date of termination. In the second trial, the district court granted GIT's motion to enforce the stipulation.

Stipulations "cannot be disregarded or set aside at will." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1097 (10th Cir. 1991) (quotation omitted). Stipulations, however, are not absolute and will be set aside to prevent manifest injustice. *United States v. Montgomery*, 620 F.2d 753, 757 (10th Cir. 1980). The district court has broad discretion to determine whether a party should be held to a stipulation or whether justice requires the stipulation be set aside. *Wheeler*, 935 F.2d at 1098. Whether a stipulation made in the first trial should remain binding during the retrial is determined by "the nature of the stipulation and the circumstances underlying its formulation." *Id.* Formal stipulations made for the purpose of relieving a party from proving facts can generally be substituted as proof of the stipulated fact in a subsequent trial of the same action. *Id.* Where, however, "a stipulation is limited expressly to a single trial and phrased in terms of conclusory, rather than evidentiary, facts, district courts may on retrial free a party from the stipulation." *Id.*

Before the district court in the first trial, the following colloquy occurred:

THE COURT:     . . . [T]he question I have for all of you is: Will you stipulate that the date from which interest will run if GIT prevails is the date of termination?

MR. KELLY:     GIT would stipulate, Your Honor.

MR. FROST:     MK would stipulate.

J.A. Vol. 5 at 1320.

Unlike *Wheeler*, a products-liability case involving a formal stipulation to the feasibility of designing a safer product, this stipulation was "phrased in terms of conclusory, rather than evidentiary, facts." *Wheeler*, 935 F.2d at 1098. MK argues it would be manifestly unjust to hold it to this stipulation when many categories of damages in the first trial were not known at the time of the stipulation or had not yet occurred. We agree, in part.

The district court did not abuse its discretion in holding MK to its stipulation for damages of the kind awarded in the first trial. Although the stipulation was not formal, district courts are vested with broad discretion in determining whether to hold a party to its prior stipulation. Where, however, damages were not incurred or known until after the first trial, the district court abused its discretion by holding MK to its 1996 stipulation. As this court explained in *Reed v. Mineta*, "prejudgment interest does not accrue until the victim actually sustains the monetary injury." 438 F.3d 1063, 1066 (10th Cir. 2006). Although a party may stipulate to paying prejudgment interest on a

-21-

damage award sustained before the monetary injury, to hold that stipulation binding for damages not contemplated or knowable in the first trial would constitute manifest injustice.

Many of GIT's damages were sustained on the date of termination. This includes the jury awards for work performed under the contract, the reasonable profit for work performed, and equitable adjustments. Post-termination costs, although technically incurred after the date of termination, were a central aspect of the first trial. When MK stipulated to the date from which interest would run, it fully understood post-termination costs would be included in this sum. It is thus not manifestly unjust to hold MK to its stipulation as to these awards. Prejudgment interest on these sums should run from the stipulated date of termination.

GIT, however, did not incur a recoverable injury with respect to its subcontractors until it settled with them.[10] *See Morrison Knudsen I*, 175 F.3d at 1249-54 (explaining settlements with subs are not a recoverable injury under the contract until settlement is reached). Nor could MK foresee the amount the subs would recover from GIT. Thus, prejudgment interest should run from the dates of settlement. GIT settled with Bogue Construction, Inc. on February 27, 1997

_____

[10]The contract obligated MK to pay GIT for, *inter alia*, "[t]he cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the [contact]."

($243,126); G.A. Western Construction Co. on September 29, 1997 ($22,597); and Keers Environmental on August 15, 1996 ($28,137). A jury awarded Robinson damages based on GIT's breach of the subcontract on December 27, 1999 ($5,831,485). The costs associated with these settlements, like the settlements themselves, were not recoverable until the date of settlement.[11] *See Morrison Knudsen I*, 175 F.3d at 1250 (quotations omitted) (explaining costs are not recoverable until they are incurred). GIT had not yet settled with its subs (save Keers Environmental) prior to the first trial. Any attempt to enforce the stipulation against MK as to costs not yet incurred as of the date of trial, and therefore completely speculative, is manifestly unjust. *See Montgomery*, 620 F.2d at 757. Prejudgment interest relating to the Bogue Construction, G.A. Western, and Robinson settlements must run from the dates on which GIT settled with them.

Despite the great discretion district courts have in calculating prejudgment interest, the district court abused its discretion by calculating prejudgment interest on the entire damage award from the date of termination. We therefore remand

---

[11]This also includes the costs GIT incurred settling with its surety, Fireman's Fund, for legal fees Fireman's Fund incurred vis-a-vis GIT's settlement with its subcontractors. A settlement agreement was reached between Fireman's Fund and GIT on August 12, 1998, almost two years after the first trial in this matter. Thus, prejudgment interest on the $51,719 Fireman's Fund award must run from August 12, 1998.

for recalculation of prejudgment interest on GIT's damage award in accordance with this opinion.

## C.    Federal or State Interest Rate

In its cross-appeal, GIT argues the trial court erred by failing to apply the Colorado interest rate instead of the federal interest rate to its award of prejudgment interest. Prejudgment interest is an element of compensatory damages and is part of the actual damages sought. *Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059, 1063-64 (10th Cir. 1992); *see also Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 335 (1988). Prejudgment interest, as an integral element of compensatory damages "is not subject to an independent choice of law analysis." *Johnson*, 964 F.2d at 1064. As a result, "the law governing compensatory damages also governs prejudgment interest." *Id.* (rejecting "smorgasbord approach" created by allowing parties to pick and choose prejudgment interest law).

By the terms of their contract, MK and GIT were bound by federal law.[12] The contract required the court to determine all substantive legal issues in accord with the FAR.  The FAR, by reference to the CDA, applies the federal interest rate.  *See* 48 C.F.R. §§ 49.112-2(d), 52.233-1(h).  The district court properly concluded that federal law applied to both the calculation of damages and prejudgment interest.

## V.    DUPLICATION OF EQUITABLE ADJUSTMENTS

MK next argues the judgment includes GIT's costs for equitable adjustment claims twice, resulting in a duplication of damages.  MK moved to amend the judgment under Fed. R. Civ. P. 59(e), asking the district court to reduce the judgment by $3,986,279, the amount of damages awarded for equitable adjustments.  The district court denied the motion.  Whether an award is duplicative is a question of fact, which we review for clear error.  *United*

---

[12]Despite GIT's protestations, Colorado law does not apply to prejudgment interest merely because this case arose under diversity jurisdiction.  A federal court sitting in diversity applies the choice of law principles of the state in which it sits.  *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003).  Colorado has adopted the approach of the Restatement (Second) of Conflicts of Laws resolving contract choice of law questions.  *Id.* "Under the Second Restatement, contracting parties may choose a particular body of law to govern their contract."  *Id.*  Absent a reasonable basis for the choice of law or a violation of a fundamental state policy, the law of the contract will govern.  *Id*.  Under the Restatement, the law chosen to govern the parties' substantive rights also governs the measure of damages.  Restatement (Second) of Conflicts of Laws § 207 (1991).

*Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1235 (10th Cir. 2000).

The contract allowed GIT to recover equitable adjustments.[13] To collect equitable adjustments, GIT had to show liability, causation, and injury. *Morrison Knudsen I*, 175 F.3d at 1244. "The contractor must not only prove that the government specifically caused its increased costs, but must prove that those costs were reasonable, allowable, and allocable under the contract." *Id.* In *Morrison Knudsen I*, the judgment was vacated, in part, because GIT failed to present sufficient evidence that it was entitled to equitable adjustments. *Id.* at 1245 ("GIT presented very little or no evidence of how MK's actions specifically caused GIT to incur the costs claimed in its damage exhibits" nor did they show "that those costs were reasonable."). Due to the district court's failure to employ a special-verdict form, this court was unable to affirm those awards that were permissible and remanded for a new trial on damages. *Id.* at 1254-55.

At the second trial, the district court employed a special-verdict form in which the several categories of damages were listed. The jury was asked to award damages in Category 1 for work performed under the contract before the effective

---

[13]The contract contained the standard federal Changes Clause for fixed-price construction contracts. *See* 48 C.F.R. § 52.243-4. The clause provides that a "written or oral order . . . from [MK] that causes a change shall be treated as a change order" and that "[i]f any change under this article causes an increase or decrease in [GIT]'s cost of . . . performance . . . [MK] shall make an equitable adjustment and modify the Subcontract in writing."

date of termination. Category 2 included the cost of storage, transportation, and other expense items incurred that were necessary for the preservation, protection or disposition of the termination inventory and equipment, i.e. post-termination costs.[14] Category 3 was entitled "Equitable Adjustments" and the special-verdict form asked the jury to identify each equitable adjustment to which GIT was entitled and specify the award on each item.

MK argues the equitable adjustments awarded in Category 3 were already included in the jury's damage calculations in Categories 1 and 2. The purpose of Category 3, MK asserts, was simply to list the equitable adjustments in order for this court to provide meaningful appellate review and ensure each equitable adjustment was properly awarded. Specifically, MK relies on Defense Exhibit K7, GIT's damage exhibit. That exhibit organized GIT's costs by two alternative methods. Exhibit K7 first organized GIT's damages by pre-termination and post-termination costs, excluding bonding, overhead, and profit. Pre-termination costs were valued at $5,273,480. Post-termination costs were valued at $1,433,458. These calculations *included* all equitable adjustments and total $6,706,938. Next, Exhibit K7 presented an alternative way of organizing the damages by presenting

_____

[14]Categories 1 and 2 also included awards for the settlement amounts GIT paid its subcontractors. MK does not claim any duplication occurred as to these subcontractor awards and, thus, these awards are not discussed in the following analysis. We include in our analysis, however, the claims associated with subcontractor profits. GIT included this sum in its request for pre-termination profit, and it therefore cannot be excluded.

the same costs, but categorizing the damages in terms of equitable adjustments and non-equitable adjustments. Equitable adjustment costs, excluding bonding, overhead, and profit, were calculated to be $3,903,771 while non-equitable adjustment costs were valued at $2,803,166. This calculation is nearly identical, totaling $6,706,937. GIT also sought costs for bonding, overhead, and profit[15] in the amount of $2,046,936.[16] Out of this sum, $1,278,947 is for non-equitable adjustment costs and profit. Thus, GIT sought $4,082,113 in non-equitable adjustment costs, $4,671,760 in equitable adjustments, and $8,753,873 total.[17]

Following closing arguments, a juror sought clarification on where specific awards should be placed on the jury verdict form. The juror asked:

> Category 1 states for GIT's work performed under the MK-GIT contract, I could interpret all work to be under the contract, including [equitable adjustments], since the contract includes the notion of [equitable adjustments.] Should or should not the number in category 1A include the [equitable adjustments]?

R. Vol. XII at 115. MK argued to the district court that equitable adjustments should only be placed in Category 3. *Id.* at 110. The district court agreed and informed MK it would instruct the jury to place its equitable adjustment awards

---

[15]Profit is calculated using 10%, rather than the 8.8% in Exhibit K7, as evidence was offered to support this higher amount.

[16]This sum excludes bonding and overhead costs for subcontractors.

[17]This calculation uses the pre- and post-termination schedule which is one dollar greater than the equitable adjustment and non-equitable adjustment schedule.

only in Category 3. *Id.* at 111. To the jurors, the district court answered the

juror's question, ". . . the answer is you should see instruction 3.2 and [] that's

related to category 3." *Id.* at 115.[18]

The jury awarded GIT a total of $7,375,808 in pre-termination and post-

termination costs, including bonding, overhead, and profit.[19] It then awarded GIT

$3,986,279 in equitable adjustments. The district court added these sums together

in the judgment. Thus, MK argues the jury award must be an improper double

recovery that the jury reached by including equitable adjustments in the pre- and

post-termination award as well as under Category 3.

This court will only disrupt a jury verdict for duplication if the verdict

amount is not within the range of evidence. *See United Phosphorus, Ltd.*, 205

---

[18]Instruction 3.2 explained GIT was entitled to recover "actual" and "recoverable" costs of work performed under the MK-GIT contract. J.A. Vol. 6 at 1735. Without specifying that equitable adjustments are a separate category, the instruction states GIT is entitled to recover equitable adjustments "incurred by GIT because MK increased the amount or difficulty of the work to be performed, accelerated or sped up GIT's performance of the work, added to or complicated the work to be performed, or required GIT to leave materials and equipment on site for MK to use after the contract was terminated." *Id.* at 1736. A plausible reading of Instruction 3.2 is that equitable adjustments should be awarded in Categories 1 and 2.

[19]These sums can be found in the jury verdict under Category I.A (pre-termination costs, including bonding and overhead); I.C.2. (pre-termination profit, including profit on subcontractors); and II.C (post-termination costs). This sum excludes subcontractor settlement costs, found under Category I.B (pre-termination); the cost of settling with MK, found under Category II.A and supported by Exhibit M25 (post-termination); and costs associated with subcontractor settlements, found under Category II.B and supported by Exhibit M24 (post-termination).

F.3d at 1228; *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 501-03 (10th Cir. 1983). "It is well settled that a verdict will not be upset on the basis of speculation as to the manner in which the jurors arrived at it." *Midwest Underground Storage*, 717 F.2d at 501. As we explained in *United Phosphorus*, even where the chance is slight that the jury arrived at the award without erroneously duplicating, if the verdict is "within the range of the evidence" it will be upheld. 205 F.3d at 1228 (quotation omitted).

Where, however, the jury verdict cannot be explained by evidence in the record and duplication is apparent, "the court, either sua sponte or on motion of a party, should reduce the judgment by the amount of the duplication," and thereby prevent double recovery. *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997). GIT contends because the total jury award of $15,644,582 was less than the $16,692,818 supported by Exhibit K7, a finding of duplication would be purely speculative. This argument, however, fails to account for the special verdict form used by the parties. For each category of damages, therefore, the jury was limited to awarding a sum supported by evidence for that specific category. The jury awarded GIT a total of $7,375,808 in pre-termination and post-termination costs. There is no evidence, however, supporting this award without including equitable adjustments. Based on GIT's damage exhibits, the maximum amount the jury could have awarded for pre- and post-termination

costs, excluding equitable adjustments, was $4,082,113. Thus, MK is correct—the jury awarded GIT equitable adjustments in Categories 1 and 2.[20]

It is clear on the face of the jury verdict form that duplication occurred, and this court must therefore reduce the verdict by the amount duplicated. MK asks this court to reduce the verdict by $3,986,279, the amount the jury awarded in Category 3. There are several approaches we may take in fashioning a remedy: (1) reduce the jury verdict by the total of all equitable adjustments awarded in Category 3 and order a remittitur, as suggested by MK; (2) reduce the jury verdict by the amount of damages in Categories 1 and 2 not supported by the evidence and order a remittitur; or (3) remand for a new trial on damages.

This court concludes a remittitur is the most appropriate remedy in this case. MK's liability was established in *Morrison Knudsen I* and is not at issue in this case. *See, e.g.*, *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981) (explaining new trial unnecessary where a court concludes no error occurred on liability). Although MK successfully proved duplication occurred, it cannot prove every equitable adjustment awarded in Category 3 was also present in Categories 1 and 2. We therefore will employ approach number two and fashion a remedy based on the maximum amount of

---

[20]GIT asserts in its brief that its damage exhibit, K7, is not the only evidence of damages. Its citations to the record, however, do not provide any additional evidence of non-equitable adjustment damages applicable to pre-termination and post-termination costs. Rather, they concern costs associated with subcontractor settlements or equitable adjustments.

damages that are reasonably supported by the evidence in the record. *See K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1161-62 (10th Cir. 1985); *see also Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985) (using a "maximum recovery rule" to determine the size of the remittitur by reducing the verdict to the maximum sum the jury could have properly awarded).

GIT established it incurred $4,082,113 in non-equitable adjustment pre-termination and post-termination costs, $3,293,695 less than the $7,375,808 awarded by the jury. Accordingly, we remand to the district court with directions to enter a remittur order for acceptance of a judgment reducing the award by $3,293,695, or, if GIT chooses, a new trial on damages. *See Malandris*, 703 F.2d at 1178.

## VI.    EQUITABLE ADJUSTMENT CLAIM FOR BOND

GIT was required to provide performance and payment bonds for the project. Under a termination-for-convenience paradigm, the contractor is entitled to recover only costs incurred for performance of the terminated work. *See* 48 C.F.R. 52.212-4(l); *see also Morrison Knudsen I*, 175 F.3d at 1243 n.26. The contract does not entitle GIT to compensation for its bond payments unless it "furnish[es] evidence of full payment to the surety company." J.A. Vol. 10 at 2649.

In its bid, GIT quoted $245,000 for the cost of providing a performance bond. MK argues that testimony at trial established GIT only furnished evidence

to MK of its payment of $80,996 in premiums for its bond payments. GIT, however, sought as an equitable adjustment and was awarded an additional $164,004. This sum represents the difference between the $80,996 that MK had reimbursed GIT for its bond payments and the amount GIT quoted MK in its bid. After GIT rested, MK moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) on GIT's claim for a bond equitable adjustment. The court denied the motion. At the close of all evidence, MK renewed its motion, which the court denied. After the court entered its judgment, including the $164,004 sum, MK requested the court amend the judgment to eliminate this damage award, arguing GIT never incurred this cost or provided evidence of payment and it was therefore not properly recoverable. The court denied the motion.

This court reviews de novo a district court's denial of a motion for judgment as a matter of law under Fed. R. Civ. P. 50. *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 738 (10th Cir. 2007). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006) (quotation omitted); *see also Miller v. Auto Club of N.M., Inc.*, 420 F.3d 1098, 1131 (10th Cir. 2005) ("Judgment as a matter of law is only appropriate when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" (quoting Fed. R. Civ. P.

-33-

50(a)(1))). All inferences are drawn in favor of the non-moving party. *Escue*, 450 F.3d at 1156.

GIT argues it is entitled to $164,004 in bond costs as an equitable adjustment and sufficient evidence supports this award. First, it contends that the evidence at trial proved $164,004 in costs were incurred as mobilization costs. Second, it argues that MK's expert witness, Thomas Caruso, testified GIT was entitled to recover $245,000 for its bond expenses. We find neither argument persuasive.

GIT never introduced evidence that it paid its surety the entire $245,000 included it its bid. In fact, the only testimony on this point establishes that GIT did not have evidence that it paid this sum. Robert Kinghorn of GIT testified about this specific claim:

Q:     Okay. And as I understand it, your claim for bond amount was $245,000.

A.     That was the price that was included on the bid.

Q.     And you were paid $80,996?

A.     Yes, that's correct.

Q.     Where is your check for $245,000?

A.     I don't have a check for $245,000.

Q.     Did you ever pay $245,000 to your bonding company?

A.     Yes.

Q.     Thank you.  You don't have a receipt for that amount, do you?

. . .

A.     No, sir.

Q.     And that payment is not reflected in your job-cost report, is it?

A.     No, the payment in the job-cost report is [$]80,996.

Q.     That is what you actually paid for your bond, isn't it?

A.     Yes, that's correct.

R. Vol. VI at 422.  Although this testimony is somewhat conflicting, GIT fails to

establish it provided MK with evidence that it paid its surety $164,004.  In fact,

Kinghorn explicitly stated GIT only paid $80,996 for the bond.

GIT does not identify evidence anywhere else in the record supporting its

claim that it paid its surety $164,004.  GIT's reliance on Caruso's testimony does

not alter this result.  Caruso testified that GIT requested $245,000 for its bond

costs.  This sum was also included in a payment request sent to MK, and Caruso

testified he believed this sum would be due to GIT.  He did not, however, testify

that GIT had paid its surety the $164,004.  Likewise, there is no evidence that

mobilization costs somehow increased the cost of providing the performance

bond.[21]  Our task is merely to examine whether GIT offered evidence to show it

_____

[21]GIT cites to testimony by Douglas Hambleton, MK's subcontract
administrator for the Slick Rock project, in support of its contention that the
$164,004 is somehow related to mobilization costs.  Hambleton opined that once
GIT provided the bond, it was entitled to the entire amount it quoted.  This
testimony explicitly differentiates between mobilization costs and bond costs and
in no way indicates how bond costs are related to mobilization costs.  Hambleton
(continued...)

paid $164,004 to its surety.  The undisputed evidence supports MK's position:

GIT failed to furnish evidence that it paid its surety any more than the $80,996

which MK reimbursed.  *See Escue*, 450 F.3d at 1156.  Under the terms of the

contract, therefore, MK was entitled to judgment as a matter of law.  On remand,

the district court is instructed to enter judgment as a matter of law for MK on the

bond equitable adjustment and reduce the judgment accordingly.

## VII.  R.N. ROBINSON & SON AND FIREMAN'S FUND

MK makes three arguments challenging the judgment against it with respect

to Robinson and Fireman's Fund.  First, it argues that GIT cannot recover any

damages for its settlement with Robinson because it never incurred those costs.

Second, it argues even if those damages were incurred, the jury improperly passed

through consequential damages to MK, which is prohibited by the FAR.  Third, it

argues Fireman's Fund is not a subcontractor and thus costs associated with the

Fireman's Fund settlement are not recoverable.  These arguments fail.

### A.    Cost of Settling with Robinson

The jury awarded GIT damages for the cost of settling with its

subcontractors.  It also awarded damages for the accounting, legal, clerical and

---

[21](...continued)
also does not provide evidence that GIT paid the entire $245,000 price in the bid.
Instead, he opined that "[i]t's 100 percent of the *premium requested* is what
[MK's] obligation is."  J.A. Vol. 39 at 11737 (emphasis added).  Although this
may have been Hambleton's understanding of how reimbursements operate, it is
not evidence that GIT actually paid $245,000 for its bonding costs.

other expenses associated with these settlements. In 1999, Robinson sued GIT and obtained a judgment in the amount of $4,699,674 ("Robinson Judgment").[22] GIT's surety, Fireman's Fund, paid Robinson $3,200,000. Robinson later filed a claim in GIT's bankruptcy case for $3,805,866. GIT asked the jury to award $7,005,886 plus overhead, profit, and bond costs for its settlement with Robinson.

MK filed a Rule 50(a) motion requesting judgment as a matter of law as to GIT's claims regarding the Robinson Judgment. The district court denied that motion. The jury awarded $5,831,485 for the settlement with Robinson and $715,451 for accounting, legal, and clerical expenses associated with Robinson's termination and settlement. Following the verdict, MK filed a Rule 50(b) motion, or alternatively, requested a remittitur. The court denied the motion.

On appeal, MK claims as a matter of law, judgment should be entered for MK on all claims arising out of the Robinson Judgment. MK argues GIT has no obligation to pay Robinson or Fireman's Fund, and thus, it cannot recover from

---

[22]The Robinson Judgment specifically broke down the award into the following categories:

| | | |
|---|---|---|
| (A) | Unpaid Contract Work | $1,699,812.00 |
| (B) | Business Impairment Damages | $2,999,862.00 |
| (C) | Equitable Adjustment-Delay Damages | $694,800.00 |
| (D) | Equitable Adjustment-Additional Work ordered by or through GIT | $608,461.00 |

The district court, finding amounts (C) and (D) to be already included in amount (A), reduced the judgment by $1,303,261 (the total of C and D).

MK any sums related to the Robinson Judgment. Further, it states GIT has not incurred any costs associated with the Robinson Judgment. This argument mischaracterizes the procedural history of this case and the law.

Robinson's and Fireman's Fund's claims against GIT were discharged in GIT's bankruptcy proceedings. A bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the debtor whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2); *see also* 11 U.S.C. § 1141(d)(1) (providing that a Chapter 11 reorganization discharges debtor from any debt arising before the date reorganization). As part of GIT's reorganization, however, Robinson's claims against GIT were discharged in exchange for a percentage of GIT's claim against MK. Thus, GIT has incurred a cost and obligation to Robinson. *See Morrison Knudsen I*, 175 F.3d at 1250 (explaining that payment of a settlement is not a prerequisite to incurring a cost). This obligation is still in effect today. Although GIT's obligations to Robinson and Fireman's Fund are contingent on the outcome of this litigation, that contingency has in fact occurred. GIT was awarded $5,831,485 for the costs associated with Robinson. Per the agreement, the proceeds will be distributed to Fireman's Fund to compensate it for the $3.2 million it paid to Robinson to satisfy the Robinson Judgment and to Robinson

itself for amounts it has still not been compensated. Thus, the district court did not err in denying MK's motion for judgment as a matter of law.

### B.  Consequential Damages

Next, MK argues the Robinson Judgment should be reduced, as it contains substantial amounts representing consequential damages, which GIT cannot recover from MK. It argues GIT was only entitled to recover from MK the "cost of GIT's settlements with construction subcontractors for actual work in place at the job site as of the termination date." This contention is without merit and GIT was entitled to recover its costs of settlement with Robinson.

Consequential and anticipatory damages are not recoverable under a termination-for-convenience paradigm. 48 C.F.R. 49.201-202; *see also Century Marine Inc. v. United States*, 153 F.3d 225, 230 (5th Cir. 1998). Where a subcontractor fails to include a termination-for-convenience clause in its contracts with other subcontractors, he may become liable for anticipatory or consequential damages. If a jury awards such damages, they cannot be passed through to the government or, in this case, MK. *See* 48 C.F.R. § 49.108-2(b)(2) ("The failure of a prime contractor to include an appropriate termination clause in any subcontract, or to exercise the clause rights, shall not . . . [i]ncrease the obligation of the Government beyond what it would have been if the subcontract had contained an appropriate clause."). Where, however, the contractor (here, GIT) has made a reasonable effort to include in the subcontract a termination clause

-39-

excluding the payment of anticipatory profits and consequential damages, all reasonable costs of settling with the subcontractor are recoverable. *Id.* § 49.108-5(a)(1)-(2). In other words, GIT can pass through its costs of settling with Robinson to MK, provided GIT included the appropriate termination clause in its contract with Robinson.

The Robinson Judgment included $2,999,862 for "Business Impairment Damages," which MK claims constitute consequential damages. The evidence shows, however, that the GIT-Robinson subcontract included a clause, incorporating all of the GIT-MK terms and thereby complying with 48 C.F.R. 49.108-5(a)(1)-(2).[23] GIT, therefore, protected itself against consequential damages. The jury was instructed to evaluate the Robinson Judgment for factual compliance with the limitations of 48 C.F.R. § 49.108-2. Therefore, the jury's award does not violate federal regulations and is supported by the evidence.

---

[23]Under this provision, a final judgment against GIT is considered a "cost of settling with the contractor" so long as, (1) the prime contractor has made reasonable efforts to include a termination clause excluding payment of anticipatory profits or consequential damages; (2) the provisions of the subcontract relating to the rights of the parties upon its termination are fair and reasonable and do not increase the common law rights of the subcontractor; (3) the contractor made reasonable efforts to settle with the subcontractor; (4) the contractor gave prompt notice of the proceedings and did not refuse to give the government control of the defense; and (5) the contractor diligently defended the suit. 48 C.F.R. 49.108-5(1)-(5). GIT introduced evidence that it met all five of these requirements.

## C.    Fireman's Fund Costs

The jury awarded GIT $51,719 for its "[a]ccounting, legal, clerical costs and other expenses associated with the termination of, and settlement with the following lower-tier subcontractors: . . . Fireman's Fund."  MK filed a Rule 59 motion to amend the judgment and eliminate the $51,719 award related to GIT's settlement with Fireman's Fund.  The district court denied the motion.

MK argues that the jury improperly classified Fireman's Fund, GIT's surety, as a "subcontractor."  Although GIT is entitled to recover its reasonable costs for settling with subcontractors, MK asserts Fireman's Fund was a bonding company, not a subcontractor.  MK, however, fundamentally mischaracterizes this award.  Fireman's Fund, in acting as a surety, incurred legal costs associated with GIT's settlement with its subcontractors, including Robinson, Keers Environmental, and Bogue Construction.  GIT was liable to Fireman's Fund for the cost of these legal fees.  Although the jury verdict appears to classify Fireman's Fund as a subcontractor, the jury was in fact awarding GIT damages incurred in settling with its subcontractors.  These costs are quintessential damages recoverable under the FAR.  48 C.F.R. § 52.249-2(g)(3)(i)-(ii) (stating under a termination for convenience, contractor is entitled to recover the reasonable costs of settlement, including "[a]ccounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement

-41-

proposals and supporting data" and for the "termination and settlement of subcontracts").

MK also erroneously claims GIT's obligations to Fireman's Fund were discharged in GIT's bankruptcy. Fireman's Fund, like Robinson, entered into an agreement exchanging its claims against GIT for a percentage of the award in this litigation. Thus, for the reasons stated above, MK's challenge is without merit.

## VIII.  POST-JUDGMENT INTEREST

In its cross-appeal, GIT contends the district court erred by applying an incorrect post-judgment interest rate. On August 16, 2006, the district court entered a Modified Amended Judgment awarding post-judgment interest to "accrue at the legal rate of 5% per annum on any and all amounts awarded herein from the date of this Modified Amended Judgment." GIT did not object to this rate in the district court, but contends on appeal that the correct legal rate on August 16, 2006, was 5.09% per annum. In response, MK claims GIT waived this challenge by failing to object below.

Post-judgment interest is calculated from the date of entry of the judgment. 28 U.S.C. § 1961(a). It is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System." *Id.* Where a district court's award of post-judgment interest involves statutory interpretation, we apply a de novo standard of review. *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1207 (10th Cir. 2004). If,

however, the district court's award of post-judgment interest is challenged on some other basis—for example a clerical error—our review is for abuse of discretion. *Id.* As GIT's challenge of the post-judgment rate does not turn on a statutory interpretation of 28 U.S.C. § 1961, we review for abuse of discretion.

First, GIT's failure to identify the error in the district court does not constitute waiver. Section 1961 entitles the prevailing plaintiff in a federal suit to post-judgment interest at the rate fixed in the statute, whether or not the party requests post-judgment interest in the complaint. *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1104 (7th Cir. 1990). Further, the Seventh Circuit held that failure to cross-appeal does not divest a court of appeals from modifying post-judgment interest when the district court erred. *Id.* This is because Rule 37 of the Federal Rules of Appellate Procedure entitles the court of appeals to award a party whatever interest he may be entitled to under the law. *Id.* This court has held, pursuant to Federal Rules of Civil Procedure Rule 60(a),[24] clerical mistakes in judgments may be corrected by the court at any time. *McNickle v. Bankers Life and Cas. Co.*, 888 F.2d 678, 681-82 (10th Cir. 1989). Thus, this court has

---

[24]Rule 60(a) states:

> **Corrections Based on Clerical Mistakes; Oversights and Omissions.** The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

authority to remand to the district court to fix any clerical errors found in the award of post-judgment interest. *Id.*

The rate set by the Board of Governors of the Federal Reserve System on August 16, 2006, was 5.09% per annum. The district court ordered "that post-judgment interest shall accrue *at the legal rate*." Therefore, the district court intended to award the proper amount, but due to a clerical error, stated that the legal rate was five percent. Failure to award post-judgment interest under § 1961(a) at the appropriate statutory rate constitutes an abuse of discretion. *See Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir. 1986). On remand, the district court is instructed to amend the judgment to reflect the accurate post-judgment interest rate of 5.09% per annum.

## IX. CONCLUSION

For the foregoing reasons, this court **affirms** the judgment in part, **reverses** the judgment in part, and **remands** for further proceedings consistent with this opinion.